No. 15-1473C
(Judge C. Lettow)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BAISTAR, MECHANICAL, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

DONALD E. KINNER
Assistant Director

DOUGLAS T. HOFFMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC 20044
Tel:  (202) 353-0547
Fax:  (202) 514-8624

June 16, 2016                    Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................... iii

STATEMENT OF THE ISSUES ................................................................................. 1

STATEMENT OF THE CASE ..................................................................................... 2

I.      Nature Of The Case ........................................................................................ 2

II.     Statement Of Facts ......................................................................................... 3

SUMMARY OF THE ARGUMENT ........................................................................... 7

I.      Standards Of Review ...................................................................................... 8

        A.      Standard Of Review For Motions To Dismiss ..................................... 8

        B.      Standard Of Review For Motions For Summary Judgment ................. 9

II.     Count I, Professional Services:  The Services Baistar Alleges It Provided Were Not
        Afforded Pursuant To The Contract At Issue, Or Any Other Express Or Implied Contract
        ........................................................................................................................ 10

III.    Count II, Tree Replacement/Removal:  The Contract Did Not Preclude The Government
        From Accepting Free Additional Trees That Were Planted By Volunteers ..................... 12

IV.     Count III, Hiking Trail Work:  Baistar Never Provided The Required Proposal, And
        Resultantly, No Proposal Was Ever Approved By The CO ............................................. 13

V.      Count IV, Historical Canal Work: AFRH Never Approved Baistar's Proposal .............. 15

VI.     Count VI, Daily Mobilization: Baistar Could Not Charge The Government To Transport
        Its Equipment And Was Not Entitled To Store Its Equipment On AFRH Grounds ......... 16

VII.    Count VIII, Unordered Services: The Government Was Not Required To Order
        Minimum Amounts Of Certain Contract Line Item Numbers (CLINs) .......................... 19

VIII.   Count V: Baistar Did Not Inform The CO Of Its Belief That It Was Performing Out-Of-
        Scope Work, Or Inform The CO Of Its Belief That The COR Was Providing Technical
        Direction Outside The Scope Of The Contract ............................................................... 23

        A.      Out-Of-Scope Snow Removal: Baistar Never Informed The CO That It Believed
                It Was Performing Out-Of-Scope Work And Placed Any Such Work At Risk ... 23

        B.      Removed Salt and Services Charges:  Baistar Never Informed The CO Of Its
                View That COR Technical Direction Was Outside The Scope Of The Contract. 26

IX.     Count VII, Improper Termination For Cause:  The Government Properly Terminated The Contract, And The Government's 2015 Cure Notice And Stop-Work Order Were Proper ................................................................................................................................ 28

        A.      The Government's Termination Was Proper Under FAR § 52.212-4(m) ............ 29

        B.      The 2015 Cure Notice Complied With The Applicable FAR Provisions And Was Not Subject To A Requirement That The CO Contemporaneously Inspect The Property Or Seek Technical Advice ..................................................................... 31

                1.      The 2015 Cure Notice Was Not Required To Comply With FAR Part 49 ... 32

                2.      There Is No Requirement That The CO, Contemporaneous With The Issuance Of A Cure Notice, Personally Inspect The Premises Or Seek Technical Advice From Non-Government Subject Matter Experts ........ 33

        C.      The Government's Stop-Work Order Was Permissible Under Contract .............. 34

        CONCLUSION ........................................................................................................................ 35

# TABLE OF AUTHORITIES

## Cases

*Advanced Cardiovascular Sys. v. SciMed Life Sys.*,
  988 F.2d 1157 (Fed. Cir. 1993)..................................................................................... 8

*Aptus Co. v. United States*,
  61 Fed. Cl. 638 (2004) ............................................................................................... 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................... 8

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...................................................................................................... 9

*Consol. Indus., Inc. v. United States*,
  195 F.3d 1341 (Fed. Cir. 1999)................................................................................... 29

*Flexfab, L.L.C. v. United States*,
  424 F.3d 1254 (Fed. Cir. 2005).............................................................................. 10, 11

*Hol-Gar Manufacturing Corp. v. United States*,
  169 Ct. Cl. 384 (1965) ................................................................................................. 9

*Hughes Commc'ns Galaxy, Inc. v. United States*,
  998 F.2d 953 (Fed. Cir. 1993)...................................................................................... 9

*J. D. Hedin Const. Co. v. United States*,
  408 F.2d 424 (Ct. Cl. 1969) ............................................................................ 29, 30, 34

*Lindsay v. United States*,
  295 F.3d 1252 (Fed. Cir. 2002)........................................................................... passim

*Lisbon Contractors, Inc. v. United States*,
  828 F.2d 759 (Fed. Cir. 1987).................................................................................... 29

*McAbee Const. Inc. v. United States*,
  97 F.3d 1431 (Fed. Cir. 1996)...................................................................................... 9

*Specialty Transp., Inc. v. United States*,
  57 Fed. Cl. 1 (2003) ................................................................................................... 29

*Steward v. United States*,
  80 Fed. Cl. 540 (2008) ...................................................................................... 8, 12, 15

*Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*,
  833 F.2d 1560 (Fed. Cir. 1987).................................................................................... 9

*Total Med. Mgmt., Inc. v. United States*,
  104 F.3d 1314 (Fed. Cir. 1997)................................................................................... 10

*Trauma Serv. Grp. v. United States*,
  104 F.3d 1321 (Fed. Cir. 1997)................................................................................... 10

## Regulations

48 C.F.R. § 1.601 .......................................................................................................... 10, 11

FAR § 12.403 ................................................................................................................ 32, 33

FAR § 49.402-3 ....................................................................................................... 31, 32, 33

FAR § 49.607 ................................................................................................................ 31, 32

FAR § 52.212-4 ........................................................................................................... passim

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BAISTAR MECHANICAL, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 15-1473C |
| | ) | (Judge C. Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

<u>DEFENDANT'S MOTION TO DIMSISS AND MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rules 12(b)(6) and 56 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss portions of the complaint of Baistar Mechanical, Inc., (Baistar) and grant summary judgment in defendant's favor with respect to the remaining portions of Baistar's complaint. This motion is filed pursuant to the Court's May 27, 2016 Scheduling Order. In support of this motion, we rely upon the following brief, the pleadings, and defendant's appendix.

<u>STATEMENT OF THE ISSUES</u>

1. Whether any of the "professional services" that Baistar allegedly provided to the Government were provided pursuant to a contract with the Government.

2. Whether the Armed Forces Retirement Home's (AFRH) Grounds Maintenance and Snow Removal Services contract precluded AFRH from accepting free tree-planting services.

3. Whether AFRH approved Baistar to perform the disputed hiking trail work.

4. Whether AFRH approved Baistar to perform the disputed historical canal work.

5. Whether the contract permitted additional payment for Baistar to transport its equipment to AFRH grounds, or entitled Baistar to store its equipment on AFRH grounds.

6. Whether the contract required the Government to order any minimum amount of services from Baistar under certain disputed contract line item numbers (CLINs).

7.     Whether Baistar ever notified the contracting officer (CO) of allegedly out-of-scope work, or notified the CO of Baistar's view that the contracting officer's representative (COR), by asking Baistar to revise its invoices to reflect charges for verified amounts of service and salt, was providing technical direction outside the scope of the contract.

8.     Whether the contract was properly terminated for default.

<u>STATEMENT OF THE CASE</u>

I.     <u>Nature Of The Case</u>

This case involves a contract for landscaping and snow-removal services.  Baistar, in eight distinct counts, contends that it is owed in excess of $1 million.  The counts Baistar raises are extremely varied.  For each count, however, Baistar's theory of recovery suffers from a legal flaw such that this matter can be resolved expeditiously without time consuming and costly discovery by both parties, and while conserving judicial resources.  Count I fails because the professional services that Baistar alleges it provided were not compensable by the Government pursuant to any express or implied contract.  Count II fails because the contract did not obligate the Government to purchase the tree planting services from Baistar.  Moreover, the tree planting that Baistar alleges was improperly contracted for was actually a donated service to plant free trees.  There is no support for Counts III (Hiking Trail) and IV (Historical Canal) because the work for which Baistar seeks compensation was never approved.  In Count V, Baistar seeks payment for allegedly out-of-scope work and unpaid services, but the CO was not informed that Baistar believed it was performing out-of-scope work, or informed that Baistar believed the COR's requests for revised invoices comprised out-of-scope technical direction.  Baistar is not entitled to compensation for daily mobilization, as claimed in Count VI, because the contract does not permit payment for equipment transport, and Baistar never had a contractual right to store its equipment on AFRH grounds.  Contrary to the claim in Count VII, Baistar was properly

terminated and the issues Baistar raises with the 2015 Cure Notice and Stop-Work Order lack merit and do not obviate the Government's proper termination.  Finally, the demand in Count VIII for payment for unordered services fails because AFRH was not obligated to order a minimum amount of services under any CLIN.

II.     Statement Of Facts

The Bureau of the Fiscal Service is a Bureau of the U.S. Department of the Treasury. The Bureau of the Fiscal Service's Administrative Resource Center (BFS) is a Federal Shared Service Provider that provides administrative services on a reimbursable basis.  In this capacity BFS provides procurement services to the Armed Forces Retirement Home (AFRH) on a reimbursable basis.  AFRH is an independent agency in the Executive branch that provides residences and related services for certain retired and former military members.  The Chief Operating Officer (COO) of AFRH heads the agency and is subject to the authority, direction and control of the Secretary of Defense.

Since around 2007, BFS has awarded approximately 24 contracts to Baistar on behalf of AFRH.  Of those 24 contracts, only one, TPD-AFRW-12-C-0002, is at issue.  The disputed contract is for commercial items – predominantly grounds maintenance and snow removal services at AFRH's Washington, D.C. campus.  A1-49.  The contract was awarded on December 16, 2011 based upon Baistar presenting the best overall value to the Government.  The period of performance was December 16, 2011 to September 30, 2012, with four one-year option periods, with a total award amount of $4,285,790.

The contract had various pricing mechanisms depending on the work being performed. For grounds maintenance services, the contract established a firm fixed monthly rate.  A2.  For snow removal services, the contract had a firm fixed price for materials, treatment was priced per event, and snow clearing was priced per hour and inch of snow.  A4-5.  For emergency and

3

special services, the contract had hourly pricing.  A2-3.  For tree removal services, the contract specified per-tree pricing.  A3.  Finally, hardscape and landscape upgrades or alterations were to be priced at the time of need.  A3.  In sum, the pricing method varied with the specific service provided under the contract.

Performance issues related to this contract were first raised to the CO in 2013.  The AFRH contracting officer's representative (COR) contacted the CO in January 2013 regarding a delay in snow removal during a January snow event.  Baistar's failure to remove snow created potentially dangerous conditions for AFRH staff and residents.  The CO issued a cure notice on January 24, 2013 that instructed Baistar to respond with a plan of action to ensure that such a situation did not reoccur.  A51.  Baistar responded on January 31 and indicated that it would take steps to ensure adequate manpower, materials, and equipment would be available to address weather conditions.  AFRH confirmed to the CO that Baistar's response was acceptable.

In February 2014, the AFRH COR again raised concerns with Baistar's performance.  The COR informed the CO that the Historic Canal was clogged with leaves and debris.  The blockage caused flooding on the AFRH campus.[1]  The blockage also made AFRH concerned about subsequent flooding if the canal were not cleared before the next rain or snow melt.  The CO issued a cure notice to Baistar on February 27, 2014.  A52.  The cure notice instructed Baistar to respond with a plan of action to correct the issue.  *Id.*  Baistar responded to the cure notice on February 28, indicating that it would remove debris and leaves in the Historic Canal by the close of business on February 28.  A53.  Baistar further stated that it would remove the leaves and debris below the bridge by March 8, 2014.  *Id.*  In addition to its proposed remedy, Baistar's

---

[1] Such flooding resulted in $2,350 in damages related to a water heater and sump pump in a basement that was flooded.  Although AFRH has not sought to recover this amount from Baistar, it reserves its right to do so.

letter raised concerns about alleged harassment from the COR. *Id*. Out of an abundance of caution, the Government replaced the COR for the contract on April 2, 2014. A57-58.

In November 2014, performance issues rearose. Specifically, AFRH staff observed thick blankets of leaves covering several areas, vegetation growing on buildings, discarded tree limbs piled on campus, and flower beds with dead flowers and needing mulch. On November 14, 2014, the CO sent Baistar a cure notice addressing these issues. A63-64. The cure notice instructed Baistar to submit a plan to correct the issues by December 1, 2014. *Id*. Baistar never submitted a response to the cure notice, and as of December 2, leaves and limbs were not cleared and flower beds still needed significant attention.

On June 18, 2015, the CO issued a cure notice (2015 Cure Notice) to Baistar for failure to comply with contract terms. A68-71. The 2015 Cure Notice identified Baistar's performance as deficient in several areas: removal of vegetation from fences and buildings, removal of debris from the grounds, dead or dying flowers and grass, and Historic Canal upkeep. *Id*. The 2015 Cure Notice instructed Baistar to respond by either remedying all of the deficiencies listed, or by submitting a plan by June 20 for how it would correct the deficiencies. A71. Baistar, rather than comply with the 2015 Cure Notice's instructions, responded on June 26 by questioning the 2015 Cure Notice's validity. A72-80. Baistar's response did not include a proposal for remedying any raised issue. *Id*. Based upon the deteriorating relationship between the parties, the tone of the questions in Baistar's response, and Baistar's allegation that the 2015 Cure Notice was unfounded, the CO determined that engaging in further discussions with Baistar would not resolve the significant issues between the parties. A74 ("Why is Baistar to blame for all the decades [*sic*] of mismanaged and abandonment of all buildings and grounds responsibilities?"); A74 ("this is not the first time [Baistar] has received a Cure Notice for work that is not inside the

scope of the Contract[,]"); A80 ("this Cure Notice is related to mistakes made by AFRH in the solicitation and pricing of the Contract . . . .").

About five days after Baistar's response to the Government, on July 1, AFRH COR James Cavanagh forwarded to the CO an email from Baistar's principal, H.K. Jun, relating to a lawnmower accident involving Baistar.  A81-83.  The email contained profanity and had an overarching tone that was threatening to Mr. Cavanagh, the COR.  A82 ("[F]or what you are doing to me and to my company . . . I will make sure that you get fired from federal contracting . . . trust me . . . I will make you fired . . . [.] ") (ellipses in original); A81 ("[Y]ou have cornered me and I have no choice . . . .").

Based upon Baistar's e-mail, the CO determined that it was unsafe for Baistar to remain on the AFRH campus.  Accordingly, the CO issued a stop work order to Baistar on July 6, 2015 (Stop-Work Order).  A84.  Baistar responded to the Stop-Work Order the same day.  A85-87.  Baistar's responsive letter objected to the Stop-Work Order and attempted to explain Mr. Jun's e-mail to Mr. Cavanagh as acceptable based upon other alleged conversations between the two that predated Mr. Jun's e-mail.  A85 ("Mr. Cavanaugh and I have had frank, candid, and perhaps inappropriate conversations quite frequently in the past.").  Mr. Jun also attempted to negotiate to have the Stop-Work Order lifted by explaining that further inappropriate communications would be impossible if he only communicated with the CO, and another Baistar employee (Mr. Frasier), communicated with the CORs.  A86 ("We request . . . Mr. Jun only be contacted in regards to the Contract at the Contracting Officer level . . . .").

On July 10, 2015, the CO terminated the contract based upon Baistar's failure to resolve the performance issues listed in the 2015 Cure Notice.  A90-95.  After the contract was terminated, Baistar submitted five claims to AFRH demanding payment for work that it allegedly

performed that was allegedly outside the contract's scope; the claims were denied.[2]  A96-106.

Baistar filed suit in this Court on December 4, 2015 to recover costs associated with the alleged

performance of out-of-scope work.  A107.  The Government filed its Answer on April 5, 2016.

Answer, April 5, 2016, ECF No. 7.  The parties filed their Joint Preliminary Status Report on

May 26, 2016 wherein the parties requested that the Court enter a briefing schedule for the

Government's dispositive motion.  JPSR, May 26, 2016, ECF No. 8.  The Court entered its

scheduling order on May 28, 2016 and the Government timely files its RCFC 12(b)(6) and 56

motion per that order.  Scheduling Order, May 28, 2016, ECF No. 9.

SUMMARY OF THE ARGUMENT[3]

The Court should dismiss portions of Baistar's complaint and grant summary judgment in

defendant's favor for the remaining counts.  Count I for professional services should be

dismissed because the allegedly provided services were not provided under any contract.  The

Government is entitled to judgment for Count II, tree planting services, because the work and

trees were donated.  Judgment should be granted for the Government for Counts III (Hiking

Trail) and IV (Historical Canal) because the claimed work was never approved for performance.

Judgment should be granted for the Government for Count VI, daily mobilization, because the

contract neither permits Baistar to charge for equipment transport, nor entitles Baistar to store

equipment on AFRH grounds.  For Count VIII, unordered services, the contract did not provide

that a minimum amount of services must be ordered for any CLIN and judgment should be

entered for the Government.  Baistar cannot recover for Count V, out-of-scope work and unpaid

---

[2] Baistar had filed one claim, on May 7, 2015, in advance of its termination.  A88-89.

[3] The Government's legal argument sections present Baistar's Counts V (out-of-scope work and revised invoices) and VII (improper termination) at the end.  Count V, in part VIII, is the penultimate section because it is slightly more complex than Baistar's other counts.  Count VII, in part IX, is the final section because Baistar's termination is best understood at the end.

services, because the CO was not informed that Baistar believed it was performing out-of-scope

work, or informed that Baistar believed the COR's requests for revised invoices comprised out-

of-scope technical direction.  Finally, for Count VII, improper termination, the issues Baistar

raises with the 2015 Cure Notice, Stop-Work Order, and termination, do not obviate the

termination.

ARGUMENT

I.   <u>Standards Of Review</u>

    A.   <u>Standard Of Review For Motions To Dismiss</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim of relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A

pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause

of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid

of 'further factual enhancement.'"  *Id.* (quoting *Bell Atl. Corp.*, 550 U.S. at 555, 557).  The Court

must accept as true all well-pleaded allegations in the complaint and draw all reasonable

inferences in favor of the plaintiff.  *Id.* at 678.  Courts, however, should regard the purpose of

Rule 12(b)(6) "to allow the court to eliminate actions that are fatally flawed in their legal

premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and

trial activity."  *Advanced Cardiovascular Sys. v. SciMed Life Sys.*, 988 F.2d 1157, 1160 (Fed.

Cir. 1993).  "[A] complaint should be dismissed under RCFC 12(b)(6) 'when the facts asserted

by the claimant do not entitle him to a legal remedy.'"  *Steward v. United States*, 80 Fed. Cl. 540,

542–43 (2008) (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).

8

B.     Standard Of Review For Motions For Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a).  It is a "salutary method of disposition designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).  As the court of appeals emphasized in *Sweats Fashions*: "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact[.]"  *Sweats Fashions*, 833 F.2d at 1563 (emphasis omitted).  Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the [Court] – that there is an absence of evidence to support the non moving party's case."  *Id.*   (quoting *Celotex Corp.*, 477 U.S. at 325) (emphasis omitted).  Thus, where the non-moving party fails to make a sufficient showing as to the existence of an essential element for which he bears the burden of proof, summary judgment is appropriate.  *Celotex Corp.*, 477 U.S. at 322-23.

Each of Baistar's claims is precluded by the explicit text of the contract.  Contract interpretation begins with the plain terms of the agreement.  *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996).  It is a bedrock principle that contracts should be interpreted to give "a reasonable meaning to all parts of an instrument," as opposed to "leav[ing] a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous."  *Hol-Gar Manufacturing Corp. v. United States*, 169 Ct. Cl. 384, 395 (1965).  At bottom, all contract terms must be given meaning.  *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993) ("A contract should be interpreted in such a way that all parts make sense.").

9

II.     Count I, Professional Services:  The Services Baistar Alleges It Provided Were Not
        Afforded Pursuant To The Contract At Issue, Or Any Other Express Or Implied Contract

Baistar seeks $71,700 in professional service fees that were allegedly provided for four

distinct projects.[4]  A124 (¶ 86).  Because any services that may have been provided were not

provided pursuant to a contract between Baistar and the Government, Baistar's Count I must fail.

"The requirements for a valid contract with the United States are: a mutual intent to

contract including offer, acceptance, and consideration; and authority on the part of the

government representative who entered or ratified the agreement to bind the United States in

contract."  *Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997).  Such

requirements "are identical for both express and implied contracts."  *Trauma Serv. Grp. v.

United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997).

No contract existed for the work allegedly performed for the "Boiler Plant

Decentralization Study & Design Services" because Baistar alleges only that "[a]round

November of 2010, Patrick Benjamin and Justin Seffens, both AFRH CORs, approached Baistar

regarding the planned decentralization of the AFRH boiler plant . . . ."  A119 (¶ 75).  Thus, the

only Government personnel alleged to have been involved are "both AFRH CORs . . . ."  *Id*.

Because these individuals are not COs, Baistar's claim must fail.  A46 (¶ 28) ("Any additional

services . . . which may be performed by the contractor . . . at the request of an individual other

than a duly appointed CO, except as may be explicitly authorized in the contract, will be done at

the financial risk of the contractor."); 48 C.F.R. § 1.601 ("Contracts may be entered into and

signed on behalf of the Government only by contracting officers."); *Flexfab, L.L.C. v. United

States*, 424 F.3d 1254, 1260 (Fed. Cir. 2005) ("A party seeking to enter into an agreement with

---

[4] Baistar's complaint addresses four apparently separate sets of facts.  A119-124.  It is
unclear whether Baistar seeks no recovery for its first set of facts "Boiler Plant Decentralization
Feasibility Study & Design Services" or whether a recovery is subsumed in one of the other
recoveries, but the Court need not address this discrepancy to resolve this motion.

the government can abate the risk by taking particular care to insure that it negotiates with a government agent whose status is that of a 'contracting officer.'"). Although Baistar also fails to adequately plead offer, acceptance, and consideration, the Court need not reach these elements because the lack of contracting authority by the named AFRH CORs is undisputed.

No contract existed for the work allegedly performed for the "Sheridan & Scott Buildings Boiler Plant Design/Build" because Baistar alleges only that "[a]bout January 2011, the CORs approached Baistar and requested a proposal for the design/build for a new boiler plant in the Sheridan Building . . . ." A119 (¶ 77). Because these individuals are not COs, Baistar's claim must fail. A46 (¶ 28); 48 C.F.R. § 1.601; *Flexfab, L.L.C*, 424 F.3d at 1260.

No contract existed for the work allegedly performed for the "North Converter New Boiler Plant – Design/Build Proposal" because Baistar alleges only that "[i]n late 2010, the AFRH CORs approached Baistar and requested a proposal for the design/build for a new boiler plant in the North Converter Building . . . ." A121 (¶ 79). Because these personnel are not COs, Baistar's claim must fail. A46 (¶ 28); 48 C.F.R. § 1.601; *Flexfab, L.L.C*, 424 F.3d at 1260.

No contract existed for the work allegedly performed for the "Hiking Trail Design/Build Proposal" because Baistar "did not receive any response to the submitted Proposal." A123 (¶ 82). Baistar alleges that "[o]n or about August 15, 2012, AFRH COR James Theros requested that Baistar provide a proposal to convert the existing AFRH mulch hiking trail to a gravel trail." A123 (¶ 80). Unlike the analysis for the above three professional services, the contract did contemplate AFRH requesting proposals "for various scenery upgrades or alterations . . . on the AFRH Campus." A41 (¶ 4.9.1). But proposal preparation is not the compensable action; the performed work – when approved by the Government – was the compensable event. A3 (CLIN 0005). And regarding the required approval, "Baistar did not receive any response to the

11

submitted Proposal." A123 (¶ 82). Because the proposal was not approved, Baistar's claim fails.

Accordingly, Count I of Baistar's "complaint should be dismissed under RCFC 12(b)(6) '[because] the facts asserted by the claimant do not entitle him to a legal remedy.'" *Steward*, 80 Fed. Cl. at 542–43 (quoting *Lindsay*, 295 F.3d at 1257).

III.    **Count II, Tree Replacement/Removal:  The Contract Did Not Preclude The Government From Accepting Free Additional Trees That Were Planted By Volunteers**

Baistar claims $6,745 to compensate it for tree services that Baistar alleges AFRH hired another contractor to perform. This count is premised upon the fact that Baistar's principal witnessed an individual, who was presumed to be another contractor, planting trees on AFRH grounds. This claim fails for two reasons.

First, the tree services at issue are not covered by the contract. Baistar asserts recovery pursuant to CLIN 39.[5] That CLIN, however, states the "[p]rice for per stump removal and per *replacement* tree per the PWS (Tree *replacement* minimum 15 gallon). $280.00"[6] A11-12 (CLIN 39) (emphasis added). The price established in CLIN 39 is for a tree that is a "replacement." A12. The trees Baistar saw being planted were not for replacement. In fact, Carol Herwig, the individual that Baistar asserts AFRH hired in lieu of Baistar, does not replace trees as part of her volunteer work for Casey Trees. A160 (¶ 7). Rather, Ms. Herwig volunteers for Casey Trees to plant *additional* trees. *Id.*

Second, the Government did not contract for such tree services; the trees were donated and the planting services Baistar witnessed were performed by a volunteer from Casey Trees.

---

[5] Baistar's complaint actually cites CLIN 29. A125 (¶ 89). We assume Baistar intended to cite CLIN 39 because it is identical to CLIN 29 except that CLIN 39 applies to Option Period III which covers the June 2015 timeframe at issue. A125 (¶ 90).

[6] Baistar's complaint misstates the price of tree replacement as $250. A126 (¶ 92).

A125 (¶ 90) ("Upon inquiry, Mr. Jun was informed that the contractor, Caroline Herwig, was planting trees that had been donated to AFRH by the Republic of Korea . . . ."); A160-61 (¶¶ 2, 3, and 8).  Ms. Herwig's declaration states that she is "an active volunteer with Casey Trees, an organization that has as its goal to restore, enhance and protect the tree canopy of the nation's capital."  A160 (¶ 2).  Her declaration goes on to state that "[a]s a Casey Trees volunteer I planted trees on the grounds of [AFRH] during 2015."[7]  A160 (¶ 3).  Her declaration closes by stating that "[a]ll of [her] tree-planting efforts on the AFRH grounds were undertaken as a volunteer; [she is] not compensated for such efforts by AFRH, or any other public or private entity."  A161 (¶ 8).

Accordingly, the Court should hold that the CLIN asserted by Baistar is inapplicable to non-replacement trees planted by volunteers and deny Baistar any recovery on its Count II.

IV.     **Count III, Hiking Trail Work:  Baistar Never Provided The Required Proposal, And Resultantly, No Proposal Was Ever Approved By The CO**

In Count III, Baistar seeks "$5,232, plus costs and fees" because an AFRH COR allegedly ordered Baistar to repair part of the hiking trail and then invoice AFRH.  A130 (¶ 105); A128 (¶ 100).  Specifically, Baistar alleges that

> In March of 2013, [an AFRH COR] told [Baistar] that the other contractor had improperly compacted the gravel, making the Hiking Trail too soft and causing it to retain moisture. Simply put, [the AFRH COR] stated that the Hiking Trail needed to be at least partially redone. [The AFRH COR] directed Baistar to replace the hardscaping for the entrance part of the trail, as this was the most visible part, and invoice [AFRH] for the work. Baistar was led to believe that, if this replacement hardscaping satisfied [AFRH], the rest of the Hiking Trail replacement hardscaping would be awarded to Baistar.

---

[7] Ms. Herwig also disputes Baistar's allegations regarding the time the trees were planted. A160 (¶¶ 4-5).  Ms. Herwig, as a Casey Trees volunteer, credibly asserts that the last AFRH tree planting by Casey Trees occurred in April and that Casey Trees does not plant trees in June.  *Id.*

A128 (¶ 100).  Baistar further alleges that it performed the work in May 2013, invoiced for the

work in June 2013, and that the invoice was rejected.  A128 (¶ 101).

    As discussed above for Count I, the contract permitted AFRH to request proposals "for

various scenery upgrades or alterations . . . on the AFRH Campus."  A41 (¶ 4.9.1).  Such

proposals were to predate approval of the proposal and the work being performed.  A6 (CLIN

0016) ("Hardscape and Landscape Upgrades or Alterations in accordance with PWS.  Service to

be priced at time of need.").  In addition to predating any work, a proposal also needed approval

from a CO because "[a]ny additional services or a change to work specified which may be

performed by the contractor . . . at the request of an individual other than a duly appointed CO,

except as may be explicitly authorized in the contract, will be done at the financial risk of the

contractor."  A46 (¶ 28).  Baistar, however, does not assert that a proposal was prepared or

approved by a CO in advance of any work being completed.  A128 (¶¶ 100-01).  Without an

approved proposal, Baistar has no basis to recover for the work it allegedly performed.

    Lacking any record of CO approval of this work, Baistar attempts to rely upon an invoice

that *followed* Baistar's alleged performance of the work.  A128 (¶ 101).  But Baistar's reliance

upon its June 5, 2013 invoice is also problematic.  First, the invoice is for $13,810, an amount

that exceeds the amount allocated for such projects.[8]  A6 (CLIN 0016) ("NTE 10,000[,] Amount:

$10,000.00 (Option Line Item)").  Second, BFS has no record of Baistar ever submitting the

invoice.  A166-67 (¶¶ 6-9).  And third, even assuming a Baistar-submitted invoice – that the CO

never received – could be interpreted to reflect CO approval of Baistar's alleged work, which it

---

[8] Although Baistar's complaint states that "this invoice has been revised for the purposes
of litigating this claim, see infra Para. 104" and such modification appears to reduce the claimed
amount from $13,810 down to "$5,232.00[,]" it is unclear why Baistar would have developed
and submitted for payment an invoice that exceeds the contract's not-to-exceed amount by over
one-third.  A128, 130 (¶¶ 101, 105).  It is similarly unclear how the value of the work could drop
by over 60 percent between the time of proposal and Baistar's claim.

cannot, Baistar's invoice was created after performance.  The contract did not permit Baistar to determine what tasks the Government would contract for merely by its performance.  Without *advance* approval Baistar had no reason to assume the Government would be contractually obligated to pay for its allegedly performed work.  A46 (¶ 28).

Accordingly, Count III of Baistar's "complaint should be dismissed under RCFC 12(b)(6) '[because] the facts asserted by the claimant do not entitle him to a legal remedy.'"  *Steward*, 80 Fed. Cl. at 542–43 (quoting *Lindsay*, 295 F.3d at 1257).  Alternatively, the Court should grant the defendant summary judgment, holding that any work Baistar performed was at risk.

V.      Count IV, Historical Canal Work: AFRH Never Approved Baistar's Proposal

In Count IV Baistar seeks $22,230, plus costs and fees, for work allegedly performed pursuant to a September 24, 2013 proposal (that was allegedly revised and resubmitted on November 6, 2013).  A134 (¶ 122); A132 (¶ 112).  But Baistar's proposal was never approved.

Baistar's proposal was comprised of three components (tree removal, stump removal, and brick repair) that encompassed CLINs 29 and 30.  A132 (¶ 112).  Tree and stump removal, based upon the timing of the proposal, fell under CLIN 29 which provided various size-dependent prices for tree removal and one price for stump removal and tree replacement.  A9.  Brick repair fell under CLIN 30, which provided that such "[s]ervice [was] to be priced at time of need."  *Id*.

Baistar asserts that this proposal was approved (over five months after the alleged initial proposal and almost four months after the alleged revised proposal) by a March 3, 2014 e-mail from the CO stating that "AFRH has accepted your proposed remedy for the historical canal. Please ensure the work is completed on time per your response."  A55.  Rather than an approval of Baistar's proposal for tree and brick work, that e-mail was the CO's response to an e-mail from Baistar regarding an earlier cure notice.  *Id*.  Baistar's earlier message pertained only to providing its remedy "to the cure notice regarding the historical canal.  Please let me know if this

remedy is acceptable or not."  *Id*.  Thus, in the e-mail cited by Baistar, the CO did not approve

the proposal discussed in Count IV that had been submitted four or five months earlier.  Rather,

by that e-mail the CO approved Baistar's response to the Government's February 27, 2014 cure

notice.  *Id*.  Indeed, Baistar, in future correspondence to Government personnel, conceded its

error when it "interpreted [the CO's] e-mail as if it referred to the proposed work dated 11-6-

2013.  I admit that it only referred to only to the [*sic*] cure notice.  I apologize for the mix-up on

my part."  A60.  Because the approval Baistar relies upon is inapplicable, as Baistar

contemporaneously conceded, the Court should find that the allegedly performed work was

unapproved, and hold that Baistar cannot recover upon Count IV.  A46 (¶ 28).

VI.    **Count VI, Daily Mobilization: Baistar Could Not Charge The Government To Transport
       Its Equipment And Was Not Entitled To Store Its Equipment On AFRH Grounds**

In Count VI Baistar claims "$10,401.89, plus costs and fees" based upon it having to

transport equipment to AFRH to perform the contract.  A152 (¶ 163).  There is no basis in the

contract for this claim for two reasons.  First, the contract price for grounds maintenance does

not include separate payment for the transport of equipment to AFRH grounds.  Second, the

contract does not allow Baistar to store equipment on AFRH grounds.

Baistar claims amounts that it allegedly incurred to transport equipment that Baistar

utilized to perform grounds maintenance tasks.  Baistar's claim is for a period beginning October

14, 2014 and ending on July 6, 2015.  A151 (¶ 162).  The CLIN applicable to Baistar's claim is

CLIN 0036, which provides that "Option Period III 10/01/2014 09/30/2015[,] Maintenance of

All Grounds Areas Firm Fixed Monthly Rate $19, 680.00 per month[,] Amount: $236, 160 . . . ."

A11.  This CLIN explicitly states that the price is a "Firm Fixed Monthly Rate" and there is no

separate CLIN related to the transport of equipment under which Baistar could charge the

Government.  *Id*.  Furthermore, paragraph 2 ("Purpose") of the contract's performance work

statement provides that the "contractor shall provide . . . *transportation*, tools, and general and specialized equipment to provide Grounds, Snow & Ice Removal, and Green Roof Maintenance Services[,]" and paragraph 11 ("Contractor-Furnished Equipment (CFE) and Vehicles") provides that "[t]he Contractor shall *furnish all equipment* and materials . . . required to perform work required under this Contract."  A32 (¶ 2) (emphasis added); A42 (¶ 11) (emphasis added).  Thus, the contract explicitly provides that Baistar was responsible for equipment transport and such transport is necessarily included in CLIN 0036's firm fixed monthly price.

In addition to the contract requiring that Baistar transport its equipment at no additional cost (pursuant to CLIN 0036 and paragraphs 2 and 11), the contract also makes clear – with paragraph 13, entitled "Contractor-Furnished Facilities (CFF)" – that "[t]he Government will not provide facilities and the Contractor shall not place, construct, or otherwise provide additional buildings or facilities at the AFRH without prior written approval."  A42 (¶ 13).  Thus, AFRH had no obligation to provide facilities or pay for equipment storage.  *Id.*  Baistar tries to overcome this contract language with two arguments.

First, Baistar argues that, pursuant to paragraphs 11 and 14, the contract contemplated equipment storage.  A42-43 (¶¶ 11, 14).  Paragraph 11 includes the prohibition that contractor furnished "vehicles or equipment not meeting applicable safety standards shall not be operated or stored on the AFRH facilities."  A42 (¶ 11).  Based on that language Baistar argues that the converse – vehicles meeting applicable safety standards *can be stored* on AFRH facilities – must be true.  A149-50 (¶¶ 154-55).  Paragraph 14 includes the direction that "[w]ithin seven (7) calendar days after expiration or termination of this performance period, the Contractor shall remove of all [*sic*] Contractor-owned vehicles, equipment, tools, supplies, materials, and other items from the AFRH."  A42-43 (¶ 14).  Based on that language Baistar argues it must be

permitted to keep such items on AFRH grounds.  A149-50 (¶¶ 154-55).  Baistar is incorrect

because both paragraphs are consistent with paragraph 13 which precludes storage facilities for

contractor equipment on AFRH grounds and any Government obligation to provide such

facilities.  For paragraph 11, if AFRH had approved facilities for Baistar's use (under paragraph

13), then those facilities would still be unavailable for storing "vehicles or equipment not

meeting applicable safety standards . . . ."  A42 (¶¶ 11, 13).  For paragraph 14, if AFRH had

approved facilities for Baistar's use (under paragraph 13), then those facilities would have to be

emptied by Baistar "[w]ithin seven (7) calendar days after expiration or termination of this

performance period . . . ."  A42-43 (¶¶ 14, 13).  Thus, the paragraphs Baistar relies upon are not

in tension with the paragraphs relied upon by the Government (CLIN 0036 and paragraphs 2 and

11) that make clear that equipment transport is included in the contract's fixed price, and also do

not create a separate AFRH duty to provide facilities that would contravene paragraph 13.

Second, Baistar argues that its impression was that it could store equipment on AFRH

grounds (because the prior contractor had done so) and that such impression was bolstered by

Baistar having allegedly done so "[f]rom December 16th, 2011, until October 16th, 2014 . . . ."

A150 (¶¶ 156-57).  But even if these alleged facts are true, they do not alter the terms of CLIN

0036, paragraph 2, 11, and 13 that together provide that AFRH was neither required to pay

Baistar for equipment transport, nor required to provide AFRH facilities to prevent Baistar from

having to perform such transport.  A11 (CLIN 0036); A32 (¶ 2); A42 (¶¶ 11, 13).

Baistar is correct that AFRH permitted Baistar to use certain facilities to store equipment

– resulting in a lower cost of performance for Baistar – for almost three-years.  But AFRH could

only extend that courtesy before it began consolidating AFRH campus functions in the northern

part of AFRH grounds.  Such consolidation was necessary to allow General Services

18

Administration freedom to conduct environmental studies, potential remediation, and offer tours to developers without hindrance from AFRH employees or contractors.  After consolidation in the northern part of AFRH grounds, AFRH could no longer allow Baistar to use the facility it had previously accessed.  But, AFRH's past practice of accommodating Baistar's desire for equipment storage does not alter the contract to obligate AFRH to either pay Baistar to transport its equipment, or continue to provide Baistar with equipment storage.  *Id.*

Accordingly, the Court should hold that Baistar was neither permitted to charge AFRH for equipment transport, nor entitled to store its equipment on AFRH grounds.

VII.   Count VIII, Unordered Services: The Government Was Not Required To Order
       Minimum Amounts Of Certain Contract Line Item Numbers (CLINs)

Baistar alleges that AFRH breached the contract by not ordering services pursuant to certain CLINs.  Specifically, Baistar alleges that AFRH was obligated to order some amount of work pursuant to CLINs for "emergency services," "special events," "tree removal," and "hardscaping" and that the Government's failure to order such services caused damages of an "amount of at least $40,000 . . . ."  A155-56 (¶¶ 194-96, 191-93, 187-190, 184-86); A156 (¶ 198).   Because AFRH was not obligated to order any services under these CLINs, Baistar should not recover as a matter of law.

CLIN 0002 (emergency services), under "Schedule of Supplies/Services[,]" states:

> Base Period – 12/16/2011 – 09/30/2012
> Emergency Services - $210.00 per hour
>
> NTE $20,000.00
> Fully Funded Obligation Amount $20,000

A2-3 (CLIN 0002).  AFRH could also order emergency services during option periods under CLINs 0013, 0027, and 0037.  A5 (CLIN 0013); A9 (CLIN 0027); A11 (CLIN 0037).  There is no requirement for AFRH to order a minimum amount of emergency services under any of these

CLINs.  The contract's Emergency Services paragraph similarly does not require that a minimum amount of services be ordered, it states only that:

> Upon notification of an emergency, the Contractor shall respond within one hour to meet with a Government COTR or AFRH Representative to initiate emergency services (example: tree across access road, tree on structure, broken irrigation pipe causing safety hazard). Upon receiving direction by AFRH Representative, the contractor personnel shall begin work within two (2) hours.

A37 (¶ 4.7.1).  As such, AFRH had no obligation to order *any* emergency services.

CLIN 0003 required Baistar to be able to provide services for special events which could also be ordered during option years under CLINs 0014, 0028, and 0038.  A3 (CLIN 0003); A5 (CLIN 0014); A9 (CLIN 0028); A11 (CLIN 0038).  The CLIN description states:

> Base Period – 12/16/2011 – 09/30/2012
> Special Events in accordance with PWS - $160.00 per hour
>
> NTE $20,000.00
> Fully Funded Obligation Amount $20,000

A3 (CLIN 0003).  There is no requirement for the Government to order a minimum amount of special services.  The contract's Special Services paragraph similarly does not require that a minimum amount of services be ordered, it states only that:

> AFRH shall notify contractor as soon as special event requirement is known, but no less than twenty four (24) hours prior to the event. Upon notification of a special event, visiting dignitary, special shows, etc., the contractor shall perform special event grounds maintenance, which include any grounds maintenance activities that are necessary to make the event area look clean, neat, professional, and sharp[.]

A37 (¶ 4.7.2).  Thus, AFRH had no obligation to order *any* special event services.

AFRH could order tree removal services pursuant to CLIN 0004 (tree removal), and during option years under CLINs 0015, 0029, and 0039.  A3 (CLIN 0004); A5-6 (CLIN 0015); A9 (CLIN 0029); A11 (CLIN 0039).  CLIN 0004, states:

20

> Base Period – 12/16/2011 – 09/30/2012
> Tree removal performed in accordance with attached PWS.
>
> Cost of tree removal shall be at a rate dependent on the diameter of the tree at 24" off of finished grade.  The Size Categories shall be priced as follows:
>
> . . . .
>
> Price for per stump removal and per replacement tree per the PWS (Tree replacement minimum 15 gallon).  $280.00.
>
> NTE $30,000
> Fully Funded Obligation Amount $30,000

A3 (CLIN 0004).  Again, there is no requirement for the Government to order a minimum amount of tree removal services.  This is also reflected in the contract's Tree and Stump Removal paragraph, which states:

> After approval by the COTR and the Historical Preservation Authority of AFRH, the Contractor shall remove dead, fallen, and/or damaged trees including stumps. The contractor shall repair and seed the soil around the removed tree area and replace the removed tree with a new minimum 15 gallon tree, which has been approved by the AFRH and the Historical Preservation Authority of AFRH, in a manner that is in accordance with current ANSI standards. All debris from the removal and replacement process shall be either mulched or disposed of at an off campus location in accordance with existing local, state, and federal regulations. If tree sections are mulched they shall be disposed of at a specified location on site determined by AFRH[.]

A37 (¶ 4.2.7).  As such, AFRH had no obligation to order *any* tree and stump removal services.

Lastly, Baistar claims AFRH was required to order hardscaping services under CLIN 0005 or the corresponding option CLINs 0016, 0030, and 0040.  A3 (CLIN 0005); A6 (CLIN 0016); A9 (CLIN 0030); A12 (CLIN 0040).  But the "Schedule of Supplies/Services[,]" states only:

> Base Period – 12/16/2011 – 09/30/2012

> Hardscape and Landscape Upgrades or Alterations in accordance with PWS.  Service to be priced at time of need.
>
> NTE $10,000
> Fully Funded Obligation Amount $10,000.00

A3 (CLIN 0005).  The Government is not obligated to make a minimum amount of orders for hardscape services.  Correspondingly, the contract's Additional Work (Hardscape and Landscape Upgrades or Alterations) paragraph does not require that a minimum amount of services be ordered, it states – in its Request for Proposals paragraph – only that:

> When requested by AFRH, the contractor shall provide proposals for various scenery upgrades or alterations to the landscape or hardscapes on the AFRH Campus. The changes shall include, but are not limited to, turf additions, tree additions, plant and/or flower bed additions, walking paver path additions, pebble or stone road additions, retaining wall additions, planter additions, or other types of hardscape or landscape additions[.]

A41 (¶ 4.9.1).  As such, AFRH was not obligated to purchase any Hardscape and Landscape Upgrades or Alterations.

These CLINs stand in stark contrast to the contract's fixed price CLINs (and the corresponding option CLINs 0011, 0012, 0026, and 0036) upon which Baistar could expect a certain payment based upon providing a recurring service.  A2 (CLIN 0001); A5 (CLINs 0011, 0012); A8 (CLIN 0026); A11 (CLIN 0036).  CLIN 0001 (Maintenance of All Ground Areas), under "Schedule of Supplies/Services[,]" states:

> Base Period – 12/16/2011 – 09/30/2012
> Maintenance of All Grounds Areas – Firm Fixed Monthly Rate $18,970.00 per month
> Obligated Amount:  $189,700.00

A2 (CLIN 0001).

In short, AFRH did not have to order any of the services about which Baistar complains. Accordingly, the Court should hold that AFRH was not obligated to order any of the services, and is not liable for its alleged failure to do so.

VIII.   Count V: Baistar Did Not Inform The CO Of Its Belief That It Was Performing Out-Of-Scope Work, Or Inform The CO Of Its Belief That The COR Was Providing Technical Direction Outside The Scope Of The Contract

Baistar seeks $230,923 for two categories of allegedly performed snow removal work – $163,882 for out-of-scope work, and $67,041 for in-scope work that Baistar alleges was improperly removed from its invoices. Because both categories of work disputes had to be immediately raised to the CO (as a dispute between the COR and Baistar about contract terms), Baistar's failure to do so makes the claimed amounts unrecoverable as a matter of law.

A.   Out-Of-Scope Snow Removal: Baistar Never Informed The CO That It Believed It Was Performing Out-Of-Scope Work And Placed Any Such Work At Risk

The first portion of Baistar's Count V seeks $163,882 for its performance of allegedly out-of-scope work – over the entire span of the contract. Baistar's claim fails because the contract has a required procedure for contemporaneously reconciling disputes between the COR and the contractor over the contract's scope, and Baistar's failure to invoke that required procedure placed any out-of-scope work that it may have performed at risk.[9]

_____

[9] The Government does not concede that any of the alleged work was out-of-scope. In fact, the Government's preliminary analysis of Baistar's 18 allegations of out-of-scope snow removal in paragraphs 131 and 132 of Baistar's complaint indicates that most, and perhaps all, of the work was in-scope. In fact, some out-of-scope work allegations by Baistar are indisputably in-scope per the contract. As two examples, Baistar asserts that AFRH requesting that parking spots be cleared in parking lot numbers 3 and 5 was an out-of-scope request. A141-42 (¶ 131). But parking lots 3 and 5 are shown on the "Snow Removal Priorities" map as "2nd. Priority Roads" and the contract, in paragraph 4.8.2 provides that "[t]he contractor shall remove snow and/or ice, including drift or piles, from all remaining paved surfaces such as roads, *parking lots*, etc. depicted on the map in (Attachment 3 and/or4) as 'Priority2'." A50; A39 (¶ 4.8.2).

23

In fact, the alleged circumstance of which Baistar complains – technical direction that is inconsistent with "the scope of the specification(s)/work statement[,]" is specifically addressed by the contract.  A16 (DTAR § 1052.201-70(c)).  The contract requires that "[t]he contractor shall proceed promptly with performance resulting from the technical direction issued by the COTR[,]" but "[i]f, in the opinion of the contractor, any direction of the COTR, or his/her designee, falls within the limitations in (c) above, the contractor shall immediately notify the contracting officer no later than the beginning of the next Government work day."  *Id*. at (e).  Paragraph (c) indisputably covers the circumstance at issue here.[10]

Baistar, however, does not even allege that it "notif[ied] the contracting officer no later than the beginning of the next Government work day."  *Id*.  Rather, Baistar advances a contract interpretation – without citation to the contract – whereby the CO was obligated to affirmatively step in to advise Baistar not to perform work based *solely* upon having been copied on an e-mail between the COR and Baistar.  A143 (¶ 132) ("Again, no contract supervisor senior to Theros *stepped in to protect the contractor from this abuse*, effectively ratifying COR Theros' contract misinterpretation.") (emphasis added); A143 (¶ 133) ("Again, no one from BFS stepped in to

---

[10] Paragraph (c) advises, *inter alia*, that "[t]he COTR does not have authority to issue technical direction that:"

(1) Constitutes a change of assignment or additional work outside the specification(s)/work statement;
(2) Constitutes a change as defined in the clause titled "Changes";
(3) In any manner causes an increase or decrease in the contract price, or the time required for contract performance;
(4) Changes any of the terms, conditions, or specification(s)/work statement of the contract;
(5) Interferes with the contractor's right to perform under the terms and conditions of the contract; or
(6) Directs, supervises or otherwise controls the actions of the contractors employees.

A16 (DTAR § 1052.201-70(c)).

correct this abuse of authority.").  Baistar's contract interpretation contravenes the contract's terms and the realities of contract administration.  Because a CO administers multiple contracts simultaneously the CO is not expected – let alone contractually required – to examine whether a COR's direction is at odds with a contract's scope of work based *solely* upon having been copied on an e-mail from the COR to the contractor.  As the contract explicitly provides, the event that necessitates that level of CO involvement is notification by the contractor.  A16 (DTAR § 1052.201-70(e)).  Absent that, the CO is allowed, pursuant to contract, to assume that the COR's technical direction is "within the scope of the specification(s)/work statement."  *Id*. at (c).

What is more, the contract explicitly states that the risk of non-payment for out-of-scope work lies with the contractor – not the Government – in these circumstances.  In addition to the afore-cited portions of the contract, the Non-Payment for Additional Work paragraph provides:

> Any additional services or a change to work specified which may be performed by the contractor, either at its own volition or at the request of an individual other than a duly appointed CO, except as may be explicitly authorized in the contract, will be done at the financial risk of the contractor. Only a duly appointed CO is authorized to bind the Government to a change in the specifications, terms, or conditions of this contract.

A46 (¶ 28); A43 (¶ 16) ("The CO is the only Government representative authorized to amend, modify or deviate from the contract.").  Thus, if an individual without contracting officer authority tells Baistar to perform out-of-scope work, and Baistar does so pursuant to its obligation to "proceed promptly with performance resulting from the technical direction issued by the COTR[,]" then Baistar places all work that it performs in advance of "immediately notify[ing] the contracting officer" at risk.  Here, because the work Baistar claims was performed during early 2013 and early 2014 – well before Baistar's July 6, 2015 claim that first notified the CO of Baistar's belief that such work was out-of-scope – Baistar should not recover for *any* of

that work, even if the Court were to find that such work was out-of-scope.  A143 (¶ 134) ("until

the spring of 2013" and "until the end of . . . (April 2014)").

      Thus, the Court should hold that Baistar may not recover its claimed amounts in the first

part of Count V as a matter of law because it assumed the risk for this work when it failed to

provide the required notice to the CO that it was instructed to perform out-of-scope work.

> **B.**     **Removed Salt and Services Charges:  Baistar Never Informed The CO Of Its
> View That COR Technical Direction Was Outside The Scope Of The Contract**

      The second portion of Count V seeks $67,041 related to revised invoices.  This claim

should fail because Baistar did not invoke the contract's procedure for contemporaneous

resolution of disputes between the COR and the contractor about contract scope.  Having failed

to exhaust the mandated contractual dispute process and thereby denying the Government its

contractually guaranteed contemporaneous opportunity to resolve disputes, Baistar should not

recover on its now untimely disputes.

      The contract only requires AFRH to pay "for items accepted by the Government that

have been delivered to the delivery destinations set forth in this contract."  A21 (FAR § 52.212-

4(i)).  Accordingly, when AFRH believed it was being charged amounts in excess of the services

or salt that Baistar delivered, AFRH requested that Baistar provide verification for the amounts

invoiced, and similarly conducted its own spot-checks to verify invoices were accurate.[11]  When

---

[11]  Multiple contract provisions permitted AFRH to seek backup and perform its own
verification techniques, including paragraphs 27, 31, and 32.  Paragraph 27 provides that "[t]he
Contractor shall respond to requests for any information from the COTR and provide said
information in a reasonable timeframe."  A46 (¶ 27).  Paragraph 31 states that "[t]he Contractor
shall be subject to inspections, audits and work interruptions by AFRH personnel and personnel
from other Government agencies."  A46 (¶ 31).  Paragraph 32 says that "[t]he contractor . . .
shall be subject to government inspections and surveillance[,]" and paragraph 32.1 further
clarifies that "[t]he CO and COTR will inspect for compliance with contract terms throughout
the contract period[]" and explains that "[t]ypical procedures include random sampling, planned
sampling, scheduled inspections, incidental inspections, and customer complaints."  A46 (¶ 32).

Baistar's backup was insufficient or AFRH verification resulted in different amounts, AFRH –
pursuant to its contractual obligation under FAR § 52.212-4(i) – requested that Baistar revise its
invoices to reflect charges for services and salt that were proper and substantiated.
Contemporaneous with these verification processes performed by the COR and Baistar, Baistar
revised its invoices.  At no time did Baistar notify the CO of its view that these verification
processes constituted "technical direction" outside the scope of the contract.  A16 (DTAR
§ 1052.201-70(c)).  In fact, the salt and services issue was never raised to the CO until Baistar
filed its November 13, 2015 claim, which was more than four months after Baistar's termination.

   Specific to Baistar's salt allegations, Baistar asserts that it is owed $44,201 for salt that
was used as far back as January 2012 because it allegedly used the salt but was improperly
forced to remove that quantity of salt from its invoices.  A144-45 (¶¶ 139-141).  Specific to
Baistar's services allegations, Baistar asserts that it should have been allowed to invoice for
$22,840 related to snow events in February and March, 2014 because it performed the work but
was improperly forced to remove such work from its invoices.  A145 (¶ 142); A147 (¶ 149).  The
Government does not concede that Baistar performed any work, or spread any salt, for which it
was not allowed to charge.[12]  Rather, AFRH verification of invoices removed improper service
and salt charges, consistent with FAR § 52.212-4(i).  Whatever potential disagreement there is
between the parties regarding the volume of salt billed, it is immaterial and irrelevant for
purposes of this motion and the Court need not resolve that issue.

   What controls disposition of that issue is the mandatory contract disputes process,
pursuant to DTAR § 1052.201-70(e), whereby a dispute between an AFRH COR and Baistar

---

[12] Additionally, the Government's preliminary investigation of Baistar's salt charges
indicates that Baistar charged the Government for salt in excess of amounts that Baistar
purchased.  The Government cannot confirm these preliminary findings absent discovery, but
may pursue counterclaims if its preliminary findings are verified.

about the proper amount to be invoiced for salt and services obligated Baistar to "immediately notify the contracting officer no later than the beginning of the next Government work day." A16 (DTAR § 1052.201-70(e)).  This is so because, a dispute of that nature would fall under, *inter alia*, DTAR § 1052.201-70(c)(4), which provides that a "COTR does not have authority to issue technical direction that . . . (4) changes any of the terms, conditions, or specification(s)/work statement of the contract . . . ."  *Id*.  For these disputed invoices, not only did Baistar not timely notify the CO, but it attempted to resolve the dispute when it *submitted* the revised invoices that removed the AFRH-challenged amounts, and *accepted* payment for such invoices.  Baistar cannot now – more than four years later – challenge the adequacy of payment made pursuant to its revised invoices.

In any event, to have raised such a challenge, Baistar was required to inform the CO of its view that the AFRH COR was issuing improper technical direction "no later than the beginning of the next Government work day."  A16 (DTAR § 1052.201-70(c), (e)).  By its very terms, this clause's purpose is to involve the CO when the facts and circumstances are recent enough to enable a just reconciliation.  Because Baistar, by waiting over four years (and until after termination) to raise these issues, has thwarted the clause's purpose and breached the contract, the Court should hold that Baistar cannot recover its claimed amounts.

IX.     Count VII, Improper Termination For Cause:  The Government Properly Terminated The Contract, And The Government's 2015 Cure Notice And Stop-Work Order Were Proper

In Count VII Baistar challenges the Government's termination decision.  The Court should uphold the Government's termination on summary judgment because, as presented below, the Government's termination fully complies with FAR § 52.212-4(m), Baistar failed to produce a plan to cure its performance deficiencies, and its challenges to the Government's

preceding 2015 Cure Notice and Stop-Work Order lack merit and do not excuse Baistar's

unsatisfactory performance.

A.      The Government's Termination Was Proper Under FAR § 52.212-4(m)

The CO has broad discretion to determine whether to terminate a contract for default.

*Consol. Indus., Inc. v. United States,* 195 F.3d 1341, 1343–44 (Fed. Cir. 1999).  When a

contractor challenges a default termination, the Government bears the burden of establishing the

validity of the termination. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765

(Fed. Cir. 1987); *see also Aptus Co. v. United States*, 61 Fed. Cl. 638, 646 (2004).  The

Government must establish that the default termination was based on "good grounds and on solid

evidence."  *J. D. Hedin Const. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969).  The same

review standards apply to the termination for cause provision, FAR 52.212–4(m), applicable to

this case.  *Specialty Transp., Inc. v. United States*, 57 Fed. Cl. 1, 12 (2003).

The Government's 2015 Cure Notice resulted from poor performance that "[r]epeated

emails, phone calls, meetings, and written notifications notifying [Baistar] of the failure to meet

the requirements . . . ha[d] not rectified . . . ."  A68.  The 2015 Cure Notice cited specific

shortfalls for nine contract paragraphs.  A68-71.  Three examples underscore the fundamental

nature of Baistar's poor performance.  First, for paragraph 4.2.1, which relates to turf

maintenance for the "Pristine Zone" (the zone with the highest maintenance standards), the

Government advised that "leaves and tree limbs litter[] the campus and the grass is dead" despite

the contract's requirement that the "[p]ristine grounds shall look well manicured and free of

weeds at all times."  A69.  Second, for paragraph 4.3.2, which relates to irrigation of the "Good

Zone," such that "[a]ll flower and shrub beds areas in this zone shall receive, as necessary,

sufficient amounts of water to present a healthy stand of plant material[,]" the Government

explained that "[t]here is no mulch in beds, the flowers are dead due to lack of water, and the

weeds are overgrown."  A69-70.  Third, for paragraph 4.7.7, which relates to the Historical

Canal that was to be "kept clean of vegetation growth and any vegetation or man-made debris

building up, which would prevent water flow[,]" the Government informed Baistar that "[t]he

Historic Canal has a buildup of leaves, sticks, trash, and debris clogging the Canal."  A70-71.

The Government further explained that "Baistar was asked to unclog the Canal, but, Baistar

threw all trash/debris onto the banks and it washed back in the canal."  A71.  Six other

Government descriptions reference similar failures to meet contract standards.  A68-71.  In sum,

the Government had "good grounds" for its 2015 Cure Notice and eventual termination.  *J. D.*

*Hedin Const. Co.*, 408 F.2d at 431.

　　　But even setting the Government's solid termination bases aside, Baistar's termination is

amenable to resolution on summary judgment because it is beyond dispute that Baistar "fail[ed]

to provide the Government, upon request, with adequate assurances of future performance."  A22

(FAR § 52.212-4(m)).  Paragraph (m), "Termination for cause[,]" of FAR § 52.212-4(m)

provides that "[t]he Government may terminate this contract, or any part hereof, for cause . . . if

the Contractor . . . fails to provide the Government, upon request with adequate assurances of

future performance."  *Id.*  The 2015 Cure Notice, after listing numerous contractual requirements

Baistar was not meeting, required that Baistar "shall remedy/cure all deficiencies listed above *or*

*provide a plan of action on how Baistar will 'cure' or correct the conditions* [by a certain time]."

A71 (emphasis added).  Rather than respond to the nine paragraphs of specific deficiencies that

were detailed in the 2015 Cure Notice, Baistar asserted that the notice was too vague and posed

various questions to the CO.  A72-80.

　　　For every condition that the Government raised, Baistar responded that it could not

formulate a plan without extensive information from the Government.  A80 ("[T]he clarifications

requested herein are necessary to fully respond to this Notice.  Please provide the requested clarifications immediately, so that we may supplement this response in short order.").  Yet the information it sought was disconnected from the nature of the deficiencies in the 2015 Cure Notice.  Some example Baistar questions are:  (1) "Why did not [*sic*] AFRH terminate the previous contractor for all the vegetation on all the buildings?" (A74); (2) "Why is Baistar to blame for all the decades [*sic*] of mismanaged and abandonment of all buildings and grounds responsibilities?" (A74); (3) "[A]re the CORs merely requiring Baistar to do the work that should have been done by other contractors for years before Baistar?" (A74); (4) "When will AFRH step in and make CMI responsible for its negligent actions, which destroyed Government property?" (A75); (5) "Is AFR favoring CMI's business profit margin more than Baistar's business profit margin?" (A75); (6) "Why is AFRH requesting for Baistar maintain [*sic*] an installation project that was performed by another contractor, especially when that contractor is a friend of the COR?" (A78); (7) "Is the Forest areas at the entrance . . . of the Hiking trail suppose [*sic*] to be treated like Good Zone if directed by the CORs?  Please advise so that Baistar may prepare another REA for this issue." (A78); and (8) "Does Baistar need to remove all trash and debris that has been build [*sic*] over the decades or even century(ies) [*sic*]?"  A79

Baistar's response focused on events unrelated to issues in the 2015 Cure Notice and did not demonstrate a satisfactory "assurance[] of future performance."  A22 (FAR § 52.212-4(m)).

B.    The 2015 Cure Notice Complied With The Applicable FAR Provisions And Was Not Subject To A Requirement That The CO Contemporaneously Inspect The Property Or Seek Technical Advice

Baistar raises two issues with the Government's 2015 Cure Notice.  First, Baistar alleges that the Government did not comply with FAR §§ 49.607 and 49.402-3(d).  A152 (¶¶ 167-68).  Second, Baistar alleges that the 2015 Cure Notice "was not based on any personal knowledge or independent judgment on the part of the CO, who did not inspect the AFRH grounds at the time

of issuance nor have any technical advice from any representative qualified in the landscaping and grounds maintenance industry . . . ."  A152-53 (¶ 169).  Baistar's challenge to the 2015 Cure Notice lacks merit and cannot excuse Baistar's inability to correct its performance deficiencies.

       1.     <u>The 2015 Cure Notice Was Not Required To Comply With FAR Part 49</u>

The FAR makes clear that, when purchasing commercial items, the Government is not required to comply with FAR Part 49.  A20 ("52-212-4 Contract Terms and Conditions – Commercial Items (June 2010)").  Specifically, FAR § 12.403, Termination, states

> [T]he paragraphs in 52.212-4 entitled "Termination for the Government's Convenience" and "Termination for Cause" contain concepts which differ from those contained in the termination clauses prescribed in Part 49.  *Consequently, the requirements of Part 49 do not apply* when terminating contracts for commercial items and contracting officers *shall follow the procedures in this section*.

FAR § 12.403(a) (emphasis added).  Thus, the 2015 Cure Notice was not required to comply with FAR §§ 49.607 or 49.402-3.[13]  Accordingly, the Court should hold that the Government's

---

[13] Although unnecessary to the resolution of this motion, even if the 2015 Cure Notice should have complied with FAR Part 49, it complied with the applicable portions.

Specifically, regarding compliance with FAR § 49.607, paragraph (a) requires that 10 days remain in the delivery period, and 10 days remained here.  Paragraph (a)'s sample cure notice contains the following additional elements:  (1) notice of conditions endangering performance; (2) a timeline for cure; and (3) notice that non-compliance could result in termination.  FAR § 49.607(a).  The Government's 2015 Cure Notice satisfied these three elements.  A68 ("The neglect of the Armed Forces Retirement Home's Grounds and Snow Removal Services as detailed in this correspondence is a breach of the contract . . . ."); A71 ("shall remedy/cure all deficiencies listed above or provide a plan of action on how Baistar will 'cure' or correct the conditions . . . no later than 2:00 PM, Easter Time, June 29, 2015."); A71 ("Please note if we are not able to resolve these issues, the contract will be terminated . . . .").

Regarding the Government's alleged non-compliance with FAR § 49.402-3(d), Baistar's allegation would fail even if FAR Part 49 applied because FAR § 49.402-3(c) (rather than § 49.402-3(d)) would apply when the Government's reason for default would fall under FAR § 52.249-8(a)(1)(i) rather than subdivisions (ii) or (iii) of the Default clause.  Under this analysis, the only requirements for the 2015 Cure Notice would be that it:  (1) "set[] a new date for the contractor to make delivery or complete performance[,]" and (2) "reserve the Government's

2015 Cure Notice was proper as described above in part IX.A, as it did not have to comply with

FAR Part 49 as Baistar alleges.

    2.    **There Is No Requirement That The CO, Contemporaneous With The Issuance Of A Cure Notice, Personally Inspect The Premises Or Seek Technical Advice From Non-Government Subject Matter Experts**

Regarding Baistar's allegation that the 2015 Cure Notice was inadequate because the CO

"did not inspect the AFRH grounds at the time of issuance nor [*sic*] have any technical advice

from any representative qualified in the landscaping and grounds maintenance industry[,]"

Baistar provides no legal bases for these alleged requirements. A152-53 (¶ 169). As discussed

above pursuant to Baistar's allegation that the Government did not comply with FAR Part 49, the

Government has complied with the applicable FAR provision, FAR § 12.403, Termination. That

provision only requires that "[t]he contracting officer shall send a cure notice prior to terminating

a contract for a reason other than late delivery." FAR § 12.403(a)(1). The CO met this

requirement. A68-71.

Baistar's attempt, without legal citation, to foist upon the Government a requirement that

the CO, contemporaneous with the issuance of the 2015 Cure Notice, inspect the premises, is

unfounded. A152 (¶ 168). Equally unfounded is Baistar's assertion that the CO,

contemporaneous with the issuance of the 2015 Cure Notice, had to have sought "technical

advice from any representative qualified in the landscaping and grounds maintenance industry . .

---

rights under the Default clause." FAR § 49.402-3(c). The 2015 Cure Notice complied with
these requirements. A71 ("Baistar Mechanical, Incorporated shall remedy/cure all deficiencies
listed above or provide a plan of action on how Baistar will 'cure' or correct the conditions,
acceptable to the AFRW, no later than 2:00 PM, Easter Time, June 29, 2015."); A71 ("Please
note if we are not able to resolve these issues, the contract will be terminated and Baistar
Mechanical, Incorporated shall be responsible for the costs of reprocurement.").

. .” A152-53 (¶ 169).[14]  As such, absent Baistar identifying a statute, regulation, or other legal authority requiring a contemporaneous inspection or professional consultation, its argument cannot excuse its inability to offer a plan to cure its deficient performance.

Accordingly, this Court should hold that the CO properly terminated Baistar's contract pursuant to FAR § 52.212-4(m) and pursuant to an appropriate cure notice without a contemporaneous inspection or professional consultation.

C.      The Government's Stop-Work Order Was Permissible Under Contract

Baistar alleges that the Government's Stop-Work Order is invalid because the contract did not permit the Government to issue such an order.  A117 (¶ 63); A153-54 (¶¶ 174-76).

As an initial matter, the Stop-Work Order was unrelated to the performance issues that necessitated the 2015 Cure Notice.  Rather, the Stop-Work Order resulted from a late-night, profanity-laced e-mail from Baistar's principal to an AFRH COR.  A81-83.  The CO deemed such e-mail sufficiently threatening to warrant the Stop-Work Order.  A84.  Although Baistar asserts that the contract does not permit the Stop-Work Order, Paragraph 31, Government Supervision of Contract Personnel, allows for such an order, stating that

> The Contractor *shall be subject to* inspections, audits, and *work interruptions* by AFRH personnel and personnel from other Government agencies.   Such inspections, audits, and *work interruptions are typical* for government contractors *and may delay the work performed by the contractor*.

A46 (¶ 31) (emphasis added).  In this case, the Stop-Work Order was a "work interruption[] by AFRH personnel and personnel from other Government agencies."  *Id.*

---

[14] Furthermore, to any extent such consultation would have assisted the CO to understand particular issues and circumstances affecting Baistar's performance, these issues should have been, but were not, raised by Baistar's response to the 2015 Cure Notice.  Rather than raise those potentially useful issues, Baistar asked a series of largely irrelevant questions.  *See infra* part IX.A.

What is more, the Stop-Work Order was issued *more than two weeks* after the 2015 Cure Notice.  A84; A68.  As such, even setting aside that Baistar's response to the 2015 Cure Notice makes clear Baistar's view that it rejected the notice and Baistar was not taking steps to rectify the shortfalls described by the 2015 Cure Notice, any Baistar efforts to rectify the shortfalls described in the 2015 Cure Notice should have been underway before Baistar's threatening e-mail caused the Stop-Work Order.  But, consistent with Baistar's view that the 2015 Cure Notice was unfounded, the Government is unaware of any additional Baistar efforts to resolve the issues noted in the 2015 Cure Notice.  Given that, consistent with Baistar's 2015 Cure Notice response, no resolution efforts were underway the Stop-Work Order could not have negatively affected Baistar's non-existent efforts.

Accordingly, the Government respectfully requests that the Court hold that the Stop-Work Order was permissible under the contract.[15]

Furthermore, because the Government's 2015 Cure Notice and Stop-Work Order were proper, the Court should uphold the Government's termination.

<u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests the Court dismiss portions of this complaint for failure to state a claim upon which relief can be granted and grant the Government summary judgment on all remaining portions of the complaint.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

---

[15] If the Court holds that the Government's Stop-Work Order was improper, the Government respectfully requests that the Court find such improper notice harmless because Baistar – as evidenced by its response to the 2015 Cure Notice, and despite having more than two weeks to do so – was not trying to rectify issues raised by the 2015 Cure Notice when the Stop-Work Order was issued.  A72-80; A68-71; A84.

ROBERT E. KIRSCHMAN, JR.
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Douglas T. Hoffman
DOUGLAS T. HOFFMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-0547

June 16, 2016                          Attorneys for Defendant